Good morning, Your Honors. Stephen Wax from Mr. Sedaghaty. The preliminary comment would be to note my objection to the court's scheduling of an ex parte argument with the government. We had, early on in the matter, filed a motion objecting to the filing of classified briefs. I recognize the court's ruling on that, but we do want to continue to note our objection. And during my argument, in all probability, in the classified portion, I will be addressing reasons why I don't believe that's appropriate. I will touch on that also in this open setting to the extent that I can. But you're not objecting to having a closed door meeting with you? I understand the government will be there. I am not objecting to that. Okay. And you understand that the court denied your motion without prejudice? Yes. So that we may hear from you in the classified session and from the government. And the court may or may not make a determination that it wants to revise that determination because, of course, it was preliminary to hearing from counsel. Understood. Thank you. Thank you. Let me proceed. Our face is covered. This is a very fact-intensive case. And it involves a voluminous record with multiple issues and sub-issues. My hope in this argument is to identify some of the high points that I believe are relevant factually and to address three or four specific areas in which I believe this court will need to make interpretations of the law. In thinking about how best to help the court in this argument, it seemed to me that it might make sense to begin by providing a brief context. We're here arguing about what is at its core a tax case. But very little of the argument is going to involve any issues of taxation or accounting, because the case was overtaken, as we see it, by issues of terrorism, classified material, and the government's withholding of evidence. Those factors skewed the manner in which the case was heard by the jury and prevented Mr. Sadagaty from mounting a fair and complete defense. The jury was required to decide three questions, and I believe it's important to keep that in mind as we get into the specifics. The three questions were all hotly contested and close. First, they had to decide whether or not there were mistakes in the year 2000 tax return that was filed by the El Jarame and Ashland charity. On that issue, the jury heard from the accountant who prepared the return, Wilcox, and experts presented by the government and defense. Tremendous contest about that issue. Were there mistakes? Second question was, if there are mistakes, who made them, Mr. Sadagaty or his accountant? And the issue there came down to a question of whether or not the accountant, Wilcox, could be relied on. And what the record shows is that this case began based on a statement by Mr. Wilcox that the critical document in the case involving the manner in which the donation at issue here, the donation from Dr. El Fiki, was disposed of, a document known during the course of the proceedings as the Springfield Building Schedule, a document that showed how much money and where it had come from was used to purchase a building in Springfield. And it's your position that that document was destroyed or is missing? No, Your Honor. Do we have that document in the record? Yes, that document is in the record. The issue is that at the outset of this case, in 2003, Mr. Wilcox said that that document, the piece of paper, was handed to him by Mr. Sadagaty, who had coded the information. In 2009, after a forensic accountant we had retained was able to determine from disks that had been prepared on the accountant's computer that that was not true, the accountant himself had coded the checks and prepared the document. He then changed his tune. So there was a tremendous issue of, can we believe this man? So in terms of who made the mistakes, close question. And then finally, the third issue that the jury had to decide was whether or not, if the mistakes, if there were mistakes and made by Mr. Sadagaty, did he act willfully? Again, close question. All of those issues, as we see it, were distorted by the manner in which the evidence was presented. I want to start with the first one that we... Mr. Waxman, as I understand, the whole thrust of the terrorism evidence was to establish willfulness, right? His intent, that that was the justification that the government offered for getting into all that. That's correct. Okay. And what we believe occurred here was that that evidence overtook the consideration of these other issues, and that the manner in which that evidence was presented, and the way in which we were prevented from rebutting it, rendered the trial unfair. I mean, I just think from a practice standpoint, the jury would want to know why would the defendant cover up and otherwise make a mistake. And I'm just wondering if that was a routine donation to a charitable foundation. Yes, that was one of the issues that the government had to prove and that we contested, for sure. All right. But let me start with the testimony of Barbara Cabral and the Brady violation. There's no dispute that there was what the district court called a discovery violation, that's in his order at page 61, and the government doesn't contest that. There's no dispute that the information that was withheld, the offer of payment and the fact of payment, is classic impeaching material. Question is, was it material? And on that score, what I direct your attention to most directly are the words of the government itself and of the district court. Because prior to the trial, the government said that the testimony about the Hodge request for money, that was the core of Cabral's testimony, that Mr. Seda did, was material, relevant, and necessary to prove intent. They said it. And they said it significantly. After the trial, when we made a motion for a new trial, they said it again in their pleadings then, and all of those sites are in the briefs to the record. What about all of the other evidence in the record that essentially proved the same thing, the training videos from the Chechnyan Mujahideen fighters, the documents that were otherwise seized from his computer, the e-mails that he received? All of those, your Honor, were circumstantial. There was one piece of direct evidence. From the computer, what the jury saw was Mr. Sedagity was interested in, was very concerned about the plight of the civilians in Chechnya. There was evidence on the computer about an effort to engage in fundraising. But the only direct evidence that Mr. Sedagity was interested in getting money to the Mujahideen fighters was the evidence that Mr. Sedagity had been in Chechnya, came from the testimony of Barbara Cabral. The government actually used the phrase that Mr. Sedagity shook down the Cabrals. There were, now, that was... Are you referring to the testimony about the conversation, send the rest of your money? Yes, yes, at the end of the Hajj, money is left over, and Barbara Cabral's testimony was that Mr. Sedagity requested the money to the Mujahideen fighters. He requested it to send it to the Mujahideen. And she's the only one that testifies to that. She's the only witness that links him with making a potential donation to the Mujahideen, is that correct? Yes, it is. And the district court, in its opinion, on the issue, at pages 51 through 53 of its motion, of its order, says that the testimony about the Hajj is probative. That's the judge's word of this question of intent. Judge Tallman, when you say, you know, they had to prove willfulness, the district court says, yes, this is probative. And he says that twice in his opinion. But then when he turned to the question of the materiality of the Cabral testimony with respect to the discovery violation, he said it's not. And I find those statements irreconcilable. Well, let's say they're not, well, let's say, in your view, they're reconcilable. Would you just comment, because I view the district court as kind of saying that this is almost cumulative. And that, we need to get past that to get back to materiality. So I'd appreciate your comments on why you view this evidence of a different nature, or not. Well, Your Honor, I have, needless to say, studied this opinion ad nauseum. And I do not find reference to it being cumulative in the opinion. What I believe he said was flat out, I don't find it to be probative. Not that there was all this other evidence, because it is not. Under what standard would we be looking at it? No review, because it involves a Brady violation. So we would need to see that it wasn't cumulative, for example. Let's just say there was another witness that said exactly the same thing, hypothetically. Sure. You could if you concluded that it were cumulative, but it's not. Well, there's no question that there was a hajj. There's no question there was a hajj. So it's simply the, his statements directing the money to be sent to the mujahideen. To the mujahideen. Was this referred, help me again, was this referred to in closing, that testimony referred to in closing? Look, Mr. Wax doesn't mention Cabral in his entire lengthy closing argument. And the reason we submit, and we made this argument in the district court, we had nothing to work with. And we know how powerful this woman's testimony was, because as she left the stand, one of the jurors gives her a good job and had to be excused. Now, time is fleeting, there are a number of other points that I'd like to get to, so unless there are any other questions about this. I guess in analyzing the issue, though, don't we have to look at the entire transcript of the trial and all of the evidence in order to determine whether or not the district court's evaluation of the impact of her testimony was cumulative? Well, Your Honor, if that had been the basis of the district court's ruling, to be sure you would need to do that. But I do not find in the district court's opinion a reference to this being cumulative. It was to disregard it, which is the position that the government took after we filed the second motion for a new trial, after they made the disclosure. They changed their position, as did the district court. The second point in the brief that we raised involving prejudice I want to touch on very briefly and make the following point. In preparing for the argument, I went back through the cases that discuss the difference between references to ethnicity as contrasted with appeals to fear and prejudice, this court having said both are improper. I went back through the cases involving gang evidence and distinguished those cases in which gang evidence was admissible because it served some other purpose, as in geesee, where there are fingerprints on the material or where a sweatshirt shows identity from a prior offense. And it seems to me that in going through those cases, in particular Kennedy v. Lockyer, which is cited in both briefs, Nobari, which distinguishes and talks about ethnic comments as opposed to appeals to prejudice, and the Waters case that this court can and should find that this case was permeated by improper evidence and argument that affected the verdict. Unless there are any specific questions about the prejudice point, I will turn to the next one. The search. Let me start on the search by saying I think I blew it. I think that I have confused and clouded the issue in the brief by focusing on incorporation. I agree. So that was going to be my first question, but I'll let you uncloud the issue first. Let me try, please. Whether or not this warrant was, excuse me, this affidavit was incorporated, the warrant includes specific language of limitation. That's the critical piece because after the magistrate judge referred to the affidavit, he said you can search for limited to the following. And then he listed only material that is relevant to tax, banking, and accounting records. There is no reference in the warrant itself, in the list of material for which the government was authorized to search that goes beyond that. So then what was seized then from the computer, ostensibly based on the description in the affidavit of the government, was the warrant. And I don't know how all this came about. Are these websites, and is that the bulk of the nature of the evidence that was then admitted that came from the search warrant that you're arguing doesn't fall within the financial record? Yes, all of the material that Judge Tallman referred to as potentially demonstrating willfulness, circumstantially, all of that. But didn't they get a subsequent warrant? Not for this. There was a subsequent warrant obtained for material that is not part of this case. Well, what about the, I thought they used a taint team in reviewing, well, first of all, they had a problem, did they not, forensically, all nine of the hard drives had been deleted? Yes, Your Honor, and we are not making any argument about, I mean, we have articulated in the brief issues with the search terms in the computer search. But we don't need to get there. The first thing that the forensic crime lab had to do was to restore the hard drive, right? Sure, sure. Okay, and there was a taint team that was segregated from the criminal, I'll call it the criminal investigative team that looked at material as the forensic lab technicians restored it? If I recall and understand correctly, that related to the search for attorney-client material only. And there was then a subsequent search warrant obtained when something that has absolutely nothing to do with this case was seen, and the government recognized. The second limitation in this warrant, which is the magistrate perhaps foreshadowing the decision in comprehensive drug testing, set up a protocol for the computer searches that included the requirement that a new warrant would need to be sought for the search for attorney-client material. If the preliminary review of the computer saw material that was outside the limited scope, and they did not do that, Judge. That's what I wanted to make clear is that of the evidence that came from this warrant that then gets introduced at trial, does any of that have to do with the second warrant? No, absolutely not, none. My question for you is if, as you conceded at the beginning of opening argument, intent is at issue in conjunction with the tax violation, and if the searching agents have an affidavit that talks about financing terrorism, why isn't that material already covered by the initial search warrant that authorizes them to seize evidence pertaining to the 7206 violation? Two reasons, Your Honor. Thank you for asking. I appreciate that. The first is what I've already said. The magistrate judge was very specific in defining records, including electronic records, the preparation of the form, bank accounts, bank transactions, et cetera. You don't find reference to videos, Mujahideen, e-mails, fundraising stuff. Second, and perhaps more significantly, again, I apologize, I blew it by focusing on the incorporation issue. When I went back and reread the affidavit, what I found was highly significant, and that is when you look at the application for the warrant, page 3530 in the record, it seeks evidence solely of the tax and CMIR, the currency reporting violations. It does not seek permission to search for evidence of a conspiracy to defraud, as was ultimately set out in the indictment. But I guess the problem I'm having with your argument is that it's too narrow. You concede that one of the elements that the government had to show was the knowing subscription of a false tax return. If the evidence of the knowing falsity is the motive to structure the transaction, the traveler's checks and so on, and hide the money in the Springfield house purchase, why wouldn't it be within the purview of the original warrant when they come upon evidence of intent to recognize that that evidence in plain view is evidence of a violation of 7206A? Two reasons, again. First, the affidavit itself did not seek permission to search for that type of evidence in the conspiracy. When it defined the violation, the violation section in the affidavit, it talks about the tax and CMIR. Yes, the affidavit then does include references to Mujahideen and videos and things of that nature. But when the affiant then went on to define records, you find a section at 3559 defining financial records. So what it seems to me has occurred here is the magistrate is given an affidavit specifically seeking permission to search for evidence of financial crimes. The affidavit makes that clear. While it includes some broader language, when the magistrate signs the warrant, he puts in the limiting language and does not include those references to Mujahideen. In fact, Exhibit B was the government's Exhibit B, correct, to the affidavit? Exhibit B to the warrant? Yes, the attachment B, correct. So in other words, the government, while it may have had the affidavit, didn't put in Exhibit B anything that was expansive that might have mirrored the affidavit. It actually limited the affidavit itself, correct? Yes, that is precisely my point. And I think a plain reading of this, that is what occurred here. Now, my time is up. There are other issues, if I can impose on the Court for additional time. If we're going to give him some additional time, then we're going to give you some additional time. Thank you, Your Honor. There's a lot of issues here. I'd like to make a brief reference to the sentencing before I turn to the portions of the case that will eventually bleed into the classified issues. And the reason I want to refer to the sentencing is that on the tax loss issue, we believe this Court will be writing on a clean slate. And I'd like to take a look at the statements that are made by the expert that we called, Mr. Owens, the former head of the Charitable Tax Section of the Internal Revenue Service. Pages 822, et cetera, in the excerpt and then at 991 and on. Because what he ends up saying, I mean, leaving aside any factual disputes, he ends up saying that even assuming all of the errors were made by Mr. Sedogaty, as the government says, as a matter of law, 26 U.S.C. 4958, the excess benefit tax, specifically says that any such benefit must be economic. And he says, based on his experience working with that, preparing that provision, there is no basis for saying that shifting a charitable donation from one charity to another is an economic gain to the manager of the charity. He says, just as a matter of law, there is not one case. But if you don't, if it doesn't go to, let me just pause it, if it didn't go to charity, then you don't get the deduction, right? The charity will lose its, in terms of the charity, what happens? What are the intermediate sanctions that are available? And what will happen is the charity will lose its tax-exempt status. But what he makes clear is that in his discussion of the regulations and the statute, there is no basis for assessing a personal tax liability on a manager of the charity. And the government offered not one case. In other words, basically you're saying that if you make a mistake on your, as a managing director or officer of a corporate, of a charitable trust, that all penalties in order to the trust, and that there's not some kind of piercing the corporate veil and it goes to your personal tax. It does go to your personal tax if you take the money and put it in your pocket. That's the economic benefit. If you self-deal with the charity, then you can be assessed a tax. But that's not what occurred here. And that was not the government's theory. Either during trial when materiality had nothing to do with the government losing money. That only comes in at sentencing. And as you recall, the government's expert, Wooten, presented two different theories of loss, which we submit show the lack of any legal basis for any loss that is personal to Mr. Sadagaty. We believe that because there are no cases that we can find, that what you have is the testimony of Wooten, which makes no, that's the government expert, no reference to statute or regulation, and the testimony of Owens, who basically wrote the law, and says this is not what that is about. I have one other area I'd like to ask you about. Unclassified summary regarding Mr. Alsinat. Yes. I recognize you're perhaps hampered to some extent because you only have the one paragraph unclassified summary, correct? That is correct. And is it your argument on this that you believe, although you don't have the documents necessarily, that there's something more that wasn't, or that this is somehow skewed in some way? What is the complaint against the summary in your view? The complaint against the summary is that it is skewed, that it includes editorial language that rendered it unusable. Alsinat has claimed, that is a term that is distinct from Alsinat has stated, Alsinat has asserted, it is reported that Alsinat has claimed. That is a term that undermines the validity of it. The second complaint that we have with it is that it appears to include information that has come from multiple sources. Alsinat, Alsaif, we don't know, Alsinat, Alsaif, Alsaif, Alsaif, Alsaif, Alsaif, Alsaif, Alsaif, Alsaif. We don't know, we can't tell how many sources are there. And on an issue as critical to the case as this was, a defendant should not be put in a position in which he cannot, if there is evidence that says this money was traced to refugee, you know, charities in Chechnya, we need to have that in a way that would show that to the jury, this did not. Had we put this in, the government would be coming back and the government would go, well, you claimed, who knows who said it, and it doesn't have evidentiary value. If it said, he stated, or as you say, it was reported that he stated that the money went to the charities for Chechen families, would that have been a statement you would have used? That would have been better if it had said, well, if it had said that he has stated this, if it had said that Alsaif, who it appears may have been spoken with here, you know, has confirmed that, well, then we have some evidence. But this does not give us that. Mr. Wax, was there any effort made to take the information disclosed in this letter and to convert it into a proposed stipulation that would be read to the jury that might have been drafted by the defense? We objected to the content and that objection was overruled. So did I propose reworking it in some way? I think my answer is by objecting to it and saying we need to get to a more appropriate statement, I did that. I did not specifically ever say, let's sit down and attempt to negotiate a stipulation. All right, so the jury heard nothing about the content of this document. That's correct. We made the strategic decision not to present this, thinking that at the end of the day it would undermine our case rather than advance it. Thank you. I'd like to hear from the government. Good morning, and may it please the Court. Kelly Zusman, appearing on behalf of the United States. Why was it that Mr. Sadagaty would be motivated to lie about what he claimed was a donation to help Chechen refugees? Why would he lie about that? So our case, which was a tax case, and if you take the time to actually read the entire transcript, which I think I've done a couple of times now, you'll see that there are an enormous amount of time is spent cross-examining Mr. Wilcox, talking about taxes, talking about the form, and the building in Springfield, Missouri. There is also a fair amount of time talking about Chechnya, and in part that's because most of us, and I would include myself, most of us were completely unaware of the Russian conflict in Chechnya and the movement of Chechen mujahideen. That was a new concept for everyone. And so part of what we had to do at the time of trial, and that we largely did through Evan Coleman, who testified as an expert, was explain. Here's what was going on, and McEwen, you asked several questions about what came from the search warrant. We actually have an exhibit that summarized all of the exhibits that we used at trial that came from the search warrant. And that's JC4. And what you see there, and Agent Anderson testified that she actually, she found thousands and thousands of emails about Chechnya. What she did was she culled them down to the relevant time period, and that was the time when the El Fiki donation came in to All Her Mane's Bank of America bank account. Up until a year and a half later, when Mr. Sedigatti is signing the tax return that everyone acknowledges was false. And Judge Tolman, you asked a question about the building schedule. That was Exhibit TW2, and that's Excerpt of Record 963. And what you'll see there is, and this is the QuickBooks entry that Mr. Wax was talking about, and it is absolutely true. Mr. Wilcox, when he was originally interviewed in, I think, 2004 or 2005, said that All Her Mane was doing the coding of those checks in QuickBooks, and then he was preparing the tax returns based on those. He later, after his memory was refreshed, he has 400 clients, it was several years later, was presented with evidence that he himself had done some of the coding. And he did the coding on this, but at trial he testified he did that coding based upon what Mr. Sedigatti told him. And so TW2, which is the Springfield building schedule, which attributes $131,000 of what was used for the building, that was the El Fiki money, and it was basically coded as being used to purchase the Springfield Mosque. And we know that's false. And when we talk about willfulness and what was evidence of his willfulness, this was a key piece of evidence for the government. Because what happened was Mr. Sedigatti was giving Mr. Wilcox one set of information, and at the same time he was giving the All Her Mane Saudi Arabia accountant, Mr. Al-Shemar, a completely different set of information. And I think what's helpful is if you lay TW2 down, that's what he gave Wilcox, that's what Wilcox used, and you lay that down next to AHIF-12 and SW-43, and those are the exhibits that show this is what Mr. Sedigatti was telling Al-Shemar. And there you see very clearly in the information that he gave to the Saudi Arabian accountant, both checks, the $21,000 that Al-Buteh ultimately deposited into his own personal account, and the $131,000 in traveler's checks were attributed to Mr. Al-Buteh. They were never designated as part of the Springfield Mosque. That was absolutely key, that was a key piece of the why. The other evidence about Chechnya, I think the other thing that's important about that in terms of... You've got your case if you have your case, but the argument is you don't need Osama bin Laden and 9-11 and these other documents to say exactly what you just said. I mean, you said you got your case, you just said you had your case, so why do you need all that other stuff that we all know is pretty inflammatory in this post-9-11 era? People are pretty sensitive to this subject. And the reason is this, the double books only got us so far. That can still be written off to, oh, I just didn't understand the numbers, there was an accounting error. We still had to establish why, what was his motivation? And that's where what we had from the computers was a significant amount of evidence that Mr. Sedigatti... And there were several questions about was she cumulative, and I agree with Mr. Wax on this point, but not completely. We got one stipulation out of the whole trial, this is good, so I'm waiting. Here it goes, and that is Judge Hogan never used the word cumulative. He never did say that Barbara Cabral's testimony was cumulative of other testimony. What he did say, though, and I think this is very important, and this is at the record, ER 62 to 63. What he said there was that her evidence was circumstantial. Her evidence was, and again, remember, she's talking about a hajj that takes place in the spring of 1999. The El Fiki donation doesn't arrive in Ashland until a year later, that's in March of 2000. The false tax return is turned in over two years later, in October of 2001. So testimony that he said he wanted you to kick out a couple hundred bucks for the Chechen brothers, and I think she referred to them as freedom fighters, for blankets and food. That's what she testified to, for the Chechen freedom fighters. Two and a half years before he files the false tax return, and you ask, was this the only How did you use her testimony in closing? Well, Mr. Gorder, who gave the opening closing, didn't refer to her at all. Mr. Gorder, in fact, talked about willfulness being like a jigsaw puzzle, and he referred to several pieces of evidence. Now, on rebuttal, we did refer to Mrs. Cabral, I believe two or three times, to talk about, really, what it was was she was part of Mr. Sedegady's overall sort of obsession, if you will, with the plight, not just of Chechen Mujahideen, but also the Mujahideen in Kosovo. So there was a question earlier about it, was she the only one who testified that he was interested in funding Mujahideen? And the answer to that is no. We also had testimony from a former Al-Harmain employee, and that was David Gartenstein-Ross, who testified that when Mr. Sedegady got back from the Hajj, he was all fired up about Kosovo, and he specifically wanted to raise money for the Mujahideen in Kosovo. Was she the only one whose testimony established that he actually did do it? That he gathered funds and... Where the money went after she gave it, after they gave it back to Mr. Sedegady. How did the district court describe the evidence that was withheld? I mean, did her test the importance of her testimony? You said it, it wasn't cumulative. How did the district court characterize it? How we characterized it, and this is at ER 63, is there was other significant evidence regarding willfulness. That, yes, she was... He didn't characterize it as cumulative? He did not characterize it as cumulative. But what he did recognize was that in the overall scheme of this trial, she was one very small piece of a very large puzzle. What was the other evidence that he directed funds to the Mujahideen? Well, the other evidence of his willfulness, that his desire to fund Chechen Mujahideen, his sympathy with the Chechen Mujahideen. That wasn't my question. What other evidence was there that he actually caused it to happen? Actually did get aid to them? I have no direct evidence. We had no direct... It was all circumstantial. But wasn't, I recall the government's characterization of this evidence, that you used the word critical when you described Ms. Cabral's testimony. Is that true? During a pretrial hearing, yes. What we said was it was one critical piece. And there was a different... You said it was critical to establishing motive and state of mind evidence, did you not? It wasn't just a passing reference. I believe there was only one reference to the relevance of her testimony. But her relevance is that she was critical to motive and state of mind? That she was an important piece, yes. She was one critical piece of motive and state of mind evidence. But she was not the exclusive piece of state of mind evidence. That there were a number of... All of the stuff from the computers... That was the only critical piece that actually made an affirmative statement, correct? About Chechin Mujahideen and the defendant's desire to send money. Send money over there? Yes, that's correct. And ultimately, I think when we talk about trying to reconcile Judge Hogan's statements about her part in this trial, what we have here is some benefit of hindsight, which is in his post-trial ruling, I think Judge Hogan was really acknowledging that... And he says several times, look, we heard a lot from both sides about the Chechin conflict. And when Mr. Wax talks about this case being distorted and that we went overboard, essentially, with our evidence about Chechnya and the Mujahideen, I think it's important to keep in mind that, again, Judge Hogan is not looking at the government's evidence in a vacuum. He's also looking at the evidence that came in from the defense. And so when we talk about photographs that the government introduced about the Chechin conflict, we also need to look at the fact that Judge Hogan allowed the defense to bring in photographs of Chechin refugees and Chechins who were blindfolded. And so the jury got to the extent that one might disagree with how far Judge Hogan exercised his discretion in allowing the lawyers to try the case that they wanted to try, that got into the issues of Chechnya. He did so, though, on a fair basis. And there were... What did this Koran and this donation to the prisons have to do with anything? The noble Koran. I understand what it is. We've read the record. What did it have to do with anything? Which is what you started out with, that this is a tax case. Right. And what it had to do with was we wanted to prove that Mr. Sata wanted to get cash into Chechnya. And even in our rebuttal, we said, look, don't get bogged down in the blankets versus bullets sort of quagmire. That this is really about he wanted to get cash into a war zone, and he didn't want the United States government to know about it. And so to that end, Mr. Sata's defense was, I'm a man of peace. I'm only interested in promoting peace and the five pillars of Islam. And in fact, part of his outreach with the community was in saying, look, we're not about violent jihad. We're about peace. And so the noble Koran was what was shipped to al-Hermayn in Ashland. And it included this violent jihad appendix that said, take up arms. Did he have something to do with opposing that appendix? Mr. David Gartenstein-Gross testified that he and Mr. Sata both complained to al-Hermayn in Saudi Arabia about that. But what's important is that they still mailed it out. They still said it. Well, he said that he was a crazy jihadist sending this stuff into prison. I mean, that was part of the closing argument. It did seem the closing argument, terrorism, jihad, crazy prison stuff, really didn't have to do with the tax case. And that you must have been aware that you risked the sort of Waters-type problem and made an affirmative decision to go there anyway. And I guess the question I have now is why didn't that taint the nature of the trial? It didn't taint the nature of the trial, in large part because the jury received all of this information. It received all of the stuff about Mr. Sata promoting peace. It also received the government's evidence that, in fact, he acquiesced in mailing out these noble Korans with the violent jihad appendix into prisons. He knew it was there. He knew it was problematic. And if you actually look at the exhibit, it's 20 pages that exhort Muslims to pick up arms and to fight. And it says, look, you're a bad Muslim if you sit at home and you don't fight. And yet this man who was promoting peace, and in part this was a response to several of the people that he called at trial, the rabbi and the Methodist minister and the high school teacher. What was the point of that, though? Was that sort of a character? Were they character witnesses? They were designated as speaking to the issue of willfulness. They were offered to show that Mr. Sata was a man of peace who would never have supported Shechem Mujahideen. So much of our evidence in the noble Koran as an example of that came in to refute that suggestion, that, in fact, there was another side to him, one that was okay with Muslims who were promoting violence. Now, unless there are further questions on the evidentiary issue, I think ultimately, though, what you saw here, I think this is somewhat unusual. Maybe, I don't know if you count this as an evidentiary issue, but the search warrant, were you going to address that separately, or was that incorporated in what you? I mean, I can certainly address any questions that you have about the search warrant. The question is this. The warrant says, Records and Communications Pertaining to the Preparation of the IRS Form. And then it talks about bank records, and it talks about credit card accounts. There's nothing in there that would suggest you can comb through all of his email and his internet searches, because none of that really relates to anything that's specified. So I'm wondering, in your view, what authority, in your view, permitted the government to make such a broad search? Sure. And that is that, first off, prior to what you just read about records and communications, it says, Evidence Concerning Subscription to a False Tax Return, as Described in the Attached Affidavit. And the attached affidavit makes clear that one of the things the government has to prove is willfulness. And I think we could have left it there. Look, any proof that we find as we go through the search of this residence and these computers that shows willfulness is fair game. We went one step further, though. And, in fact, the affidavit, which was incorporated and it was used by the agents as they executed this warrant and as they did their computer searches, narrowed the definition of willfulness because it talked about, We think he wanted this money to get into the Chechen war zone. And, in fact, we've interviewed Mr. Wilcox, and we've determined that he was given false information. He had no idea this money went into Chechnya. Does that have anything to do with the preparation of the tax return? I mean, usually in these warrant cases, and I think I agree with Mr. Wex, he kind of went into backwards use of the warrant. You can't usually use the warrant when it's incorporated there and you have a situation like the drug testing or some of those other cases. This is a case where we have a limitation. Usually it's where the limitation is too broad. So then the agents say, Well, look, I looked at the warrant. I realized that what we were there for was a drug bust. So it wasn't like I was looking for stuff to do with his tax returns or I wasn't looking for receiving stolen property or some other crime. I used the warrant to limit the specificity, which is overbroad. This is the flip side of that. You have very specific limitation in the warrant. You're not using the affidavit to justify that limitation. So I'm just having trouble, and if you read these words in English, they don't have anything to do with what was seized. Do you have a case that would be closer than the ones that have been cited or which of the ones cited do you think I should look at to have a better understanding of your position? And I don't have a case that I think is factually analogous to this one. What I would say, though, is Mr. Wax has suggested that the affidavit here really expanded the search. It made it much broader than we needed to go. And I would turn that around and say no. What we did here was we used this affidavit to go through a number of computer records. And when you mention e-mails, there's actually some e-mails that are specifically discussed in the affidavit between Mr. Seda and Mr. Albute. So we knew we were going to be going through e-mails and through computer records when we did this search. And, in fact, what happened, though, was instead of looking for- It also said in here computers. I mean it says computers right in the specificity. Right. And so what we were looking for as Agent Anderson went through those computers was, as Judge Hogan found, a specifically circumscribed list of search terms that all fit within the scope of the affidavit that was looking for evidence of willfulness, that it was looking for evidence that Mr. Sedagati was particularly interested in sending money to Chechnya, that he was motivated to send money into this Chechen war zone. And that's what we were looking for. So, for example, when we did come across- We came across a whole series of videotapes at the site. And many of them were war-related, were about training and military-related. And because Agent Anderson wasn't sure if that would fit within the definition of the warrant, we got the consent of Mr. Jonas Sedagati, who was represented by counsel. So this affidavit was, in fact, used to narrowly circumscribe the search, to e-mail communications, to evidence that Mr. Sedagati was particularly interested in. In this relevant time period of 2000, when the El Fiqui donation came in, he was interested in getting money to the Chechen Mujahideen. And I would point you specifically to a couple of exhibits that came out of that, Search Warrant 5 and Search Warrant 6, which were two exhibits in which these were advertising circulars from Al-Harmain that said, make donations for the Chechnya Relief Fund. And they included in those circulars, specifically, the Al-Harmain Ashland, Oregon bank account number. So that's what we were looking for. That's what we got. And I would just defer to Judge Hogan, who examined all of this and said, look, they did what they were supposed to do. The search warrant itself and the execution were narrowly tailored to the objectives of the investigation. And although Judge Hogan never made a finding on this, we also argued that we acted in good faith, that our agents made every attempt to follow the scope of the affidavit and the warrant to the letter. And, in fact, Agent Anderson testified that if she had any questions as she was going through this, she consulted with Assistant U.S. Attorney Christopher Cardani, just to make sure that we weren't exceeding the bounds of it. Judge Hogan found it was good that there was no – that, in fact, it was. Let me ask you, if we determined that the search went beyond the warrant, what would be the remedy at this stage? Well, at this stage, I guess I would posit that it depends on where you drew the line with scope. We certainly argued that we would be entitled to severance, that because the bulk of the warrant was good, it would only be those items that were seized outside of the execution of the warrant. And then at this stage, I guess you would have to undertake a harmless error analysis to determine whether or not there was any effect from any of those additional exhibits. But, again, I think ultimately Judge Hogan made the right call, that the affidavit properly incorporated to the warrant and to Attachment B circumscribed this search as the magistrate intended, as the parties intended. And so, therefore, it was appropriate for him to deny the motion to suppress. Unless there are further questions on that issue. No. Okay. In terms of sentencing, Judge Hogan made a number of calls that – and we don't think there was any clear error. He was presented with conflicting – and I'm sorry, I'm out of time. Please address them. Thank you. So, basically, he was confronted with dueling experts on the whole issue of the tax loss. So he had the defense expert, Marcus Owens, testifying that there was no loss here, this was simply a pass-through. He also had the testimony of our expert, Mr. Wooten, who said, no, what happened here was when that money from El Fiki went into the Bank of America account, they did too much with it for this to simply be considered a conduit. Most significantly, there was never an explanation. We never figured out why El Boutte pocketed the $21,000. And, certainly, that was not consistent with the donor's intent. That was never made clear why he would simply take that amount off the top and put it into his own personal account. So, for that reason, Mr. Wooten testified that there was this conversion, and that it was. It was an excess benefit to Mr. Sedegatti. And that was how we reached the tax loss. How did it become an excess benefit to him when it goes in the other guy's pocket? Let's just assume it did. Right. Well, the $21,000 went into El Boutte's pocket. It is a conspiracy. El Boutte is an unindicted co-conspirator. And so, therefore, and there was no question. Everyone who testified said that Mr. Sedegatti was the boss. He was in charge of Al-Harmain United States. What was the practical effect of the tax benefit on the actual sentence? He started off with a base offense level of 14 because of the amount of the tax loss. But subject to a That means that if there was an error, the sentence would be reduced by what? 14, if you took away the tax loss, then I believe he'd be looking at a range of zero to six months as opposed to 27 to 33, which is what he faced. And is the issue of the tax loss in terms of the tax code a legal matter in your view? I believe in this case it was a factual matter because he was presented with conflicting information from two experts and that he did not clearly err when he relied upon Mr. Wooten's testimony about the significance of this understatement, this false line on the tax return, and whether or not that would be of interest to the IRS and then what the consequences would be for that misstatement. Okay. Unless there are further questions, if I may just conclude with, Judge Hogan had a really daunting task in all of the issues that were raised in this case. You have two volumes of all of his opinions and orders. It was a tough case, but I think Judge Hogan fairly balanced the interests of both the government in trying to explain the why and the defendant in wanting to show that he was a man of peace and that the jury did in fact receive this case fairly and that the verdict was sound and should be affirmed. Thank you. Thank you. You have two minutes for rebuttal. Let me start at the end. We believe that the sentencing issue is one of law and the review needs to be de novo. Well, I mean, isn't it a mixed question of law and fact? Because isn't it informed by the manner in which your client received the money, utilized the auspices of the foundation, and then returned it to Saudi Arabia in deciding whether it's attributable to him as income? Yes. We made several layers of argument in the brief. One of them is, and that was the part of the record that I referred to earlier, where Mr. Owen said even assuming the facts as the government has described them, so taking those facts out, he says as a matter of law, this is not an excess benefit or taxable to Mr. Sadagaty. So while we did make the argument in the brief that there are factual disputes, my point here is you don't need to go there because our experts said as a matter of law, this just doesn't apply. What about the conspiracy? Does that change anything? I don't believe so. In terms of the legal import of the issues, what – excuse me, Your Honor, I misspoke. You'll find in Owen's testimony that as the manager portion of the potential assessment, there could be a $2,000 assessment to Mr. Sada if there is a finding that El-Buteh pocketed the $21,000, so that as a matter of fact, if that is found, then he did say there is, as the manager portion, $2,000. So that would make this – Zero to six. Zero to six. It's still in the zero to six range with the loss of that level. The other points that I want to make quickly are this. In terms of the government saying that all of their evidence about the – that we call prejudicial was to rebut our presentation of the rabbi and the minister, et cetera, clearly as we see it, we were attempting to undo the damage that the government had done, needless to say, we came second. With respect to the government's reference to the videos and the effort to seek consent to search, we believe that – When you say we came second, that – All the prejudice was in the record and we – The Koran evidence was there. All of that was in the record and we did what we could to try to rebut it. When the government says that the – it recognized potentially that the videos that it seized were outside the scope of the warrant and then they went to seek consent for the videos. So within the house during the course of the search they find a pile of videos. We see that as supporting our argument because it's a recognition on the scene, geez, maybe these videos of the war in Chechnya are actually outside the scope. And if they have that question at that point, it seems to me, that underscores the points that we have made. But, Mr. Wax, I'm having a hard time squaring your argument with the language of the items to be seized because in the portion that Judge McEwen read to Ms. Zussman, it does refer to records and communications, including electronic records and communications, involving the individuals or entities above. And there are a number of Saudi names listed and suspected financing organizations that would all be relevant to the falsity in the subscribing of the tax return. Your Honor, if that phrase was not followed by the pertaining to the preparation of an IRS form, I think that there could be an argument, although I think the other limitations still keep this constricted to accounting-type records. So if you find an al-Haramain email about accounting, that could be within the scope of the warrant. I guess that's the problem. I'm trying to apply a common-sense reading to the warrant as the law enforcement officer would execute it. And I go back to the questioning I had for you earlier about evidence of intent, because if it authorizes the seizure of electronic records and communications to prove that the return was falsely subscribed, why couldn't that involve non-financial records that might contain admissions as to how the money was actually going to be used? If the magistrate had done that, needless to say, this issue wouldn't be in the brief. But he did not. Well, the question is how we interpret this language, right? That is the order authorizing seizure inherent in the search warrant once Magistrate Cooney signs it. And it seems to me that the portion that you're referring to, because he includes the phrase pertaining to the preparation of the form, that is consistent with what follows. If there's an email from Mr. Sadagotti to an accountant in Saudi Arabia that is found that says, look, I want to hide this or that on the tax return, that would be a record or communication preparing to the preparation of the form. But when you find a webpage of a dead Russian, when you find a video of the Russian-Chechen War and the devastation in Grozny, that has nothing on its face that says it's in any way related to the preparation of the tax return. The magistrate could have put that in. He did not. Thank you very much for the additional time. Thank you. The case just argued, United States v. Sadagotti, is submitted with respect to the public portion.
judges: Schroeder, McKeown, Tallman